## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA

MARKEL INSURANCE COMPANY,    )
    )
Plaintiff,    )
    )
    v.    )
    )    CASE NO.: 2:16-CV-220-HAB
UNITED EMERGENCY MEDICAL    )
SERVICES, LLC, ABRAHAM A.    )
NADERMOHAMMADI, and LILLIAN    )
MARLENE RAU, as Personal    )
Representative of the Estate of    )
Decedent, CHESTER R. STOFKO,    )
    )
Defendants.    )
_____    )
    )
UNITED EMERGENCY MEDICAL    )
SERVICES, LLC,    )
    )
Third-Party Plaintiff,    )
    )
    v.    )
    )
INSURANCE SERVICE CENTER, INC.    )
n/k/a ARTHUR J. GALLAGHER & CO.,    )
    )
Third-Party Defendant.    )
Defendants.    )
_____    )
    )
ERIE INSURANCE COMPANY,    )
    )
Intervener.    )

## OPINION AND ORDER

A chain of regrettable events has led to this litigation, which features five groups

of litigants with various competing and overlapping interests. On one side is Plaintiff

Markel Insurance Company (Markel). Markel seeks a declaration concerning insurance coverage for an ambulance owned by its insured, Defendant United Emergency Medical Services, LLC (United), who is part of the second category of litigant. This group also includes United's employee, Defendant Abraham A. Nadermohammadi. On January 2, 2016, Nadermohammadi was driving the ambulance when it was involved in a fatal accident with a vehicle occupied by Chester R. Stofko.

The third litigant group is Defendant Lillian Marlene Rau, as Personal Representative of the Estate of Decedent, Chester R. Stofko (Rau). She filed a lawsuit in state court against Nadermohammadi and United (the Rau Suit) to recover damages related to the accident.

The fourth group involved in this litigation is Third-Party Defendant Insurance Service Center (ISC), who was brought into the litigation when United filed a Third-Party Complaint alleging that, should a court determine that the Markel insurance policy does not provide coverage to United for the accident of January 2, 2016, the lack of coverage is due to ISC's acts or omissions. United asserts that, even though it requested that ISC add the ambulance to its coverage in place of another vehicle, ISC did not make the requested change and procure the proper insurance coverage.

Finally, the intervener, Erie Insurance Company, insured Chester R. Stofko for underinsured/uninsured motorist coverage. Erie has an interest in the outcome of this declaratory action regarding Markel's coverage because this determination will impact whether Erie affords underinsured/uninsured coverage.

## PROCEDRUAL BACKGROUND

Markel is seeking judgment that, as a matter of law, it has no duty to indemnify United or Nadermohammadi, and that it has no duty to defend with respect to the Rau Suit [ECF No. 94]. Rau objects to Markel's Motion and has filed a cross-motion for summary judgment [ECF No. 114]. Rau argues that, under the facts of this case, Indiana law permits the ambulance to be deemed covered under the policy, notwithstanding that it was not formally listed in the policy. Rau submits that effective notice of a requested policy change was given when United sent an email to ISC on March 30, 2015. The email notified ISC that the ambulance was being placed back in service after being temporarily removed from the policy to undergo repairs. United's email asked that an ambulance already listed in the policy be removed and that the repaired ambulance take its place. The ambulance, however, was never added to the schedule of covered vehicles. In fact, ISC disputes that it ever received the email. Rau maintains that, under Indiana's Uniform Electronic Transfer Act, an email is effective when received even if no one is aware of its receipt.

Rau also submits that equity demands that the Markel policy be reformed to cover the ambulance because there was a mutual mistake. Finally, Rau contends that, even if this Court determines that United failed to disclose that it wanted the ambulance reinstated, such failure was unintentional and cannot result in a denial of coverage under the policy's "savings clause," which provides that "any unintentional failure to disclose" a material fact "will not result in a denial of coverage under this policy."

United also objects to Markel's motion for summary judgment and filed a cross-motion for summary judgment [ECF No. 116] against Markel. United submits that it directed Markel to change the policy, through the March 30 email to its agent ISC, but Markel failed to do so. Like Rau, United advances theories of policy reformation due to mutual mistake, and extension of coverage through equity.

ISC objects to Markel's motion for summary judgment [ECF No. 117] and believes that the Court should find coverage (although it has not filed a cross-motion). ISC relies, not on notions of equity or reformation due to mutual mistake, but solely on the portion of the Markel policy related to unintentional failures to disclose, which contains the saving clause Rau referenced. Additionally, ISC opposes Rau's Cross-Motion [ECF No. 121], but only to the extent that Rau's designated evidence and argument bear on its defense of the third-party claims United brought against ISC for failing to procure insurance for the ambulance. ISC moves for summary judgment [ECF No. 122] against United related to United's Third-Party Complaint assertions that ISC committed professional negligence.

United opposes ISC's Motion related to the third-party claims [ECF No. 130].[1] Rau also opposes ISC's motion [ECF No. 131] and submit that, if the Court determines that

---

[1] On the docket, ECF No. 130 is linked to ECF No. 122, ISC's Motion for Summary Judgment. However, ECF No. 130 is titled Defendant/Third-Party Plaintiff United Emergency Medical Services' Reply (to Insurance Service Center, Inc.'s Response) in Support of Cross-Motion for Summary Judgment. It specifically "incorporates each and every statement and argument put forth by Rau at [ECF No.] 127." (ECF No. 130 at 2.) Those statement and arguments largely concern the effect of United's email to ISC, and are intended to defeat Markel's Motion for Summary Judgment and support judgment as a matter of law in favor of coverage. United's filing ends by requesting that the Court enter summary judgment in favor of United on all counts, and against ISC and Markel.

Markel is not obligated to provide coverage for the ambulance, then it should determine that ISC breached its duty to procure insurance coverage and deny ISC's motion for summary judgment on the third party claims United has brought against ISC.

In summary, the following motions are pending: Plaintiff's Motion for Summary Judgment [ECF No. 94]; Rau's Cross-Motion for Summary Judgment [ECF No. 114]; United Emergency Medical Services, LLC's Cross-Motion for Summary Judgment [ECF No. 116], and; Third Party Defendant Insurance Service Center, Inc.'s Motion for Summary Judgment Against Third Party Plaintiff United Emergency Medical Services, LLC [ECF No. 122]. Also pending is Rau's Motion to Take Judicial Notice of Computer Science Facts [ECF No. 115], and ISC's Request for Oral Argument [ECF No. 129].

## STANDARD OF REVIEW

Summary judgment is warranted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The non-moving party must marshal and present the court with evidence on which a reasonable jury could rely to find in their favor. *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). A court must deny a motion for summary judgment when the nonmoving party presents admissible evidence that creates a genuine issue of material fact. *Luster v. Ill. Dep't of Corrs.*, 652 F.3d 726, 731 (7th Cir. 2011) (citations omitted). A court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of

record, whether there is any material dispute of fact that requires a trial." *Waldridge v. Am. Heochst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).

Facts that are outcome determinative under the applicable law are material for summary judgment purposes. *Smith ex rel. Smith v. Severn*, 129 F.3d 419, 427 (7th Cir. 1997). Although a bare contention that an issue of material fact exists is insufficient to create a factual dispute, a court must construe all facts in a light most favorable to the nonmoving party, view all reasonable inferences in that party's favor, *Bellaver v. Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and avoid "the temptation to decide which party's version of the facts is more likely true," *Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003).

The fact that cross-motions for summary judgment are pending does not alter the standard. When evaluating each side's motion, the court simply "construe[s] all inferences in favor of the party against whom the motion under consideration is made." *Metro. Life Ins. Co. v. Johnson*, 297 F.3d 558, 561–62 (7th Cir. 2002) (quoting *Hendricks-Robinson v. Excel Corp.*, 154 F.3d 685, 692 (7th Cir. 1998)).

## STATEMENT OF FACTS[2]

United is a limited liability company that runs a fleet of ambulances. Steven Pavek, who served as United's Administrative Director, was tasked with obtaining insurance for the ambulances. Since about 2007, Pavek worked with Jack Rosen of ISC to procure insurance. In insurance terminology, ISC is considered a producer for Markel. Although

---

[2] Additional facts crucial to resolution of the issues may be set forth in the analysis section of this Opinion and Order.

Pavek and Rosen worked together for many years prior to the January 2016 accident, they only communicated by telephone and email, and routinely exchanged documents and forms by email.

United's annual insurance renewal deadline was March 5. For the 2014–2015 policy period, Rosen sent an email to Pavek on January 29, 2014, reminding United of the upcoming renewal. Rosen asked that the application be completed on or before February 12, 2014. Rosen directed Pavek to verify the vehicle schedule, stressing the importance of listing "every operable bus on the policy." (ECF No. 123-3 at 1.) Pavek responded ten days later by email, asserting that he had left Rosen voice messages and emails with no response, asking Rosen to get in touch with Pavek at his earliest convenience. (*Id.*) According to Rosen, he did not receive any emails or calls from Pavek as claimed in the email.

On March 3, 2014, two days before the renewal deadline, Rosen called United and spoke to Pavek, who told Rosen to work with United owner Jason Blankinship. During this call, Rosen learned that Pavek was ill and this illness was the likely reason for United's delayed communications about renewal. On the morning of March 4, 2014, Rosen emailed Pavek and Blankinship instructing them what paperwork was needed to effectuate United's renewal. Pavek responded by email with the required forms and requested that coverage be bound for renewal.

The next day, Pavek emailed Rosen to inquire whether he had received Pavek's March 4 email, including the signed documentation. Rosen's response, thirty-eight minutes later, was that he had not received United's email with the signed forms.

However, Rosen advised that he was able to renew coverage effective March 5, 2014, without the documents, and that they could be forwarded at his convenience. Pavek emailed a response to Rosen, explaining that he thought United's email server was "not pushing mail out sometimes." (ECF No. 123-5 at 1.) Pavek acknowledged that he suspected Rosen had not received the email, as Rosen would have indicated that he got it. Rosen acknowledged Pavek's email, indicated that he received what was needed to renew United's coverage, and reminded Pavek that United still needed to make the premium payment.

As the next renewal anniversary approached, Rosen again reached out to United to begin the renewal process. Rosen emailed Pavek on January 30, 2015, asking that he turn in United's renewal paperwork by February 9, 2015. Rosen did not receive a response from Pavek by February 9, 2015, so he called Pavek to determine if United was going to provide renewal information. On February 10, 2015, Pavek emailed that he would have United's paperwork to Rosen by the end of the day.

When Rosen did not receive United's renewal paperwork on February 10, 2015, Rosen followed up with an email on February 13, 2015. On February 23, Pavek indicated that he was resending the materials, and thought United was "having email issues again" as he had "sent this twice." (ECF No. 123-8 at 1.) Pavek wrote, "If I do not get a reply by the end of Business day I will call to confirm and fax instead. Please let me know you received it." (*Id.*)

On February 27, 2015, still during the renewal process, Pavek emailed Rosen about insurance changes. Specifically, he identified two trucks with motor issues. He thought

that "Truck 1" identified as a 1999 Chevy C3500 with VIN # 1GBJC34J2XFO97228 was "permanently done" and should be removed. (ECF No. 114-2 at 69.) With respect to a second ambulance, "Truck 2" Pavek asserted that he did not know if it was salvageable. He asked that Truck 2, identified as a 2003 Ford E-350 with VIN# 1FDSS34F32HA74497 (Ford #4497) be removed. He advised, "This unit is the unit I am unsure of viability moving forward but it will [be] some time before I do, say at least 60 days + repair time." (*Id.*) Ford #4497 is the ambulance that was involved in the January 2016 accident. Pavek's email also identified a third ambulance that United wanted to add to the Policy.

Rosen forwarded Pavek's email about removing Truck 1 and Truck 2 and adding the third vehicle to ISC's Gladys Jara. The accompanying message read: "United will be renewing their program. Please see below for changes that we will be making on their program Monday." (ECF No. 114-2 at 69.) On March 3, 2015, Jara sent an email to Markel asking that it bind coverage effective March 5, 2015, with the changes identified in Pavek's February 27 email: the removal of two vehicles, including the Ford #4497, and the addition of another vehicle.

Markel renewed United's coverage for the 2015-2016 policy year under policy number MTA70000847-02, effective from March 5, 2015, to March 5, 2016 (the Policy). When the Policy was issued, the following five autos were listed in the Business Auto Declarations section in Item Three of the Policy:

**Item Three: Schedule Of Covered Autos You Own**

| Auto No. | DESCRIPTION | PURCHASED | | TERRITORY |
|---|---|---|---|---|
| | Year, Model, Trade Name, Body Type, Serial Number(s), Vehicle Identification Number (VIN) | Original Cost New | Actual Cost NEW (N) USED (U) | Town & State Where the Covered Auto will be principally garaged |
| 1 | 1994 FORD E350 1FDJS34H4RHB34050 | | | Cedar Lake, IN 116 |
| 2 | 1999 FORD E450 1FDXE40F9XHB45766 | | | Cedar Lake, IN 116 |
| 3 | 2003 FORD E350 1FDSS34F83HA11199 | | | Cedar Lake, IN 116 |
| 4 | 2007 FORD E350 1FDSS34P27DA39294 | | | Cedar Lake, IN 116 |
| 5 | 1997 FORD E350 1FDJE30F7VHC10143 | | | Cedar Lake, IN 116 |

As requested by United in Pavek's February 27, 2015, email, the schedule of vehicles did not contain the Ford #4497. However, when ISC sent auto ID cards for the renewal to Pavek's email, it included a card for the Ford #4497 in addition to the other five vehicles listed in the Policy.

On March 30, 2015, Pavek emailed Rosen, and copied Blankinship, requesting that the Ford #4497 be put back on the Policy, and that the 1994 Ford that was listed on the Policy be removed. Pavek did not confirm Rosen's receipt of the email or otherwise follow-up regarding the request.

On January 2, 2016, an ambulance owned by United and driven by Nadermohammadi struck a vehicle occupied by Stofko. According to the police report generated by the responding officer, the ambulance operated by Nadermohammadi at the time of the automobile collision was a 2002 Ford Econoline E350, VIN Number 1FDSS34F32HA7*4497*, i.e., the Ford #4497.

After the accident, Blankinship located the March 30, 2015, email. By this time, it had become apparent that the Ford #4497 had not been put back on the Policy and that Rosen was asserting that he had not received any instruction from Pavek regarding the Ford #4497 subsequent to the February 27 correspondence asking that it be removed from the Policy at renewal. On January 4, 2016, Blankinship forwarded the email to Pavek, who

forwarded it to Rosen at ISC. Pavek explained to Rosen that he had worked with United's mail host, Google, to restore all the emails in their domain name, which allowed United to locate messages going back seven years. Pavek admitted that he had not been able to locate any reply from Rosen with respect to the March 30 email.

The email that Pavek forwarded to Rosen was formatted as follows:

From: Steven Pavek [mailto:s.pavek@unitedems.com]
Sent: Monday, March 30, 2015 5:49 PM
To:

'

Jack Rosen

' CC: 'Jason Blankinship'

Subject: Re: Ambulance Change

Jack,

Also before I forget we took a truck off the policy a few months ago for a transmission issue that was down for a few months. I'm sure you recall this, I know Thomco doesn't like us to add & remove units like musical chairs. However this truck I have just been informed passed inspection so it can be pressed back into service. The back truck that old 1994 that we added at renewal. Let take that off as it will be removed from service. It will still be plated and certified as a back up unit but removed from service with supplies and stock there is no need to insure it.

So remove 1994 E-350 VIN 1FDJS34M4RHB34050

And put back on the truck that we took off which is.

2003 E-350 VIN #1FSS34F32HA74497

I can just write int in on the state form and hopefully they wont have a problem with it.

*Steven Pavek*
**Partner / Executive Director**

(ECF No. 116-7 at 1 (errors in original).) Pavek also testified that the March 30 email appeared in his sent mail folder. During the discovery conducted in this litigation, a copy of the March 30, 2015, email was provided that did not identify Blankinship as a cc'd recipient. Rather, it showed Pavek sending Blankinship a copy of the email sometime after its original transmission. (ECF No. 118-1 at 2.) According to Rosen, the first time he saw the March 30 email was when Pavek forwarded it to him in January 2016, after the accident.

On past occasions when United had emailed ISC to add or remove vehicles from Markel's policy, United received an endorsement from Markel to reflect the changes. No endorsement was sent to United showing the changes requested in the March 30 email. The Policy contemplated the ability to make changes to the Policy as follows:

> This policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy.

(ECF No. 19-1 at 19.) United was the Named Insured. However, to initiate changes, the producer (ISC) was required to send a written request to Markel. The request would then be placed in Markel's underwriting file. As the producer, ISC did not have any authority to bind coverage.

An endorsement added the following condition to the Markel Policy: "Notice given by or on behalf of the insured to any of our authorized agents in Indiana, with particulars sufficient to identify the insured, shall be considered to be notice to us." (ECF No. 19-1 at 24.)

**ANALYSIS**

In moving for summary judgment, Markel designates evidence to show that the Policy that was in effect on January 2, 2016, did not list the Ford #4497 in the schedule of covered autos. It is undisputed that the Policy provided "Symbol 7" coverage, which meant that autos covered were "[o]nly those 'autos' described in Item Three of Declarations for which a premium charge is shown." (ECF No. 19-1 at 11, 27.) Markel had not issued any endorsement that made changes to the autos that were covered when the Policy was renewed in March 2015.

Rau, United, and ISC all submit that this is not the end of the inquiry, but for different reasons.

**A.    ISC & Rau-Unintentional Failure to Disclose Hazards**

According to ISC and Rau, the Ford #4497 should be covered by operation of a provision of the Policy titled "Unintentional Failure to Disclose Hazards." The provision was contained in a Medical Transport Commercial Automobile Extension, and provided:

> Paragraph **B.2. Concealment, Misrepresentation or Fraud of SECTION IV- BUSINESS AUTO CONDITIONS** is replaced by the following:
>
> 2. **Concealment, Misrepresentation or Fraud**
>
> This policy is void in any case of fraud by you at any time as it relates to this policy. It is also void if you or any other "insured," at any time, intentionally conceal or misrepresent a fact concerning:
>
>   a. This policy;
>   b. The covered 'auto';
>   c. Your interest in the covered 'auto'; or
>   d. A claim under this policy.

13

> Any unintentional failure to disclose or misrepresentation of a material fact at any time by you or any other "insured" will not result in a denial of coverage under the policy because of such concealment or misrepresentation.

(ECF No. 19-1 at 62.) ISC and Rau refer to the last paragraph of this provision as a "savings clause."

ISC and Rau argue that any failure by United to disclose the Ford #4497 as a scheduled auto was unintentional. Moreover, the replacement of the Ford #4497 with another vehicle would have maintained five vehicles on the covered auto list, and Markel would have collected the same premium. Accordingly, under the terms of the savings clause, United's unintentional failure to disclose a material fact cannot be a reason to deny coverage.

Markel counters that it is not attempting to void the Policy or deny coverage due to any concealment or misrepresentation of a material fact, but because the Ford #4497 is not listed in the Business Auto Declaration as a covered auto. Further, none of United's actions amended the Policy or otherwise met the requirements for the formation of a contract. Markel argues that the Court cannot "save" coverage that does not otherwise exist.

"Contracts of insurance are governed by the same rules of construction as other contracts." *Colonial Penn Ins. Co. v. Guzorek*, 690 N.E.2d 664, 667 (Ind. 1997) (first citing *Eli Lilly & Co. v. Home Ins. Co.*, 482 N.E.2d 467, 470 (Ind. 1985); then citing *Shedd v. Auto. Ins. Co.*, 196 N.E. 227, 230 (1935)). Insurance contracts "must be construed as a whole," which "requires reading beyond isolated phrases." *Weidman v. Erie Ins. Grp.*, 745 N.E.2d

292, 297 (Ind. Ct. App. 2001). Although ambiguities are construed in favor of the insured, clear and unambiguous policy language must be given its ordinary meaning. *Eli Lilly*, 482 N.E.2d at 470. An ambiguity exists where the provision is susceptible to more than one reasonable interpretation. *Id.*

ISC and Rau argue that the Policy is written broadly so that it applies to "any unintentional failure to disclose . . . at any time." Thus, failure to disclose that the Ford #4497 was to be added to the Policy's list of covered autos, in replacement of another covered auto, is not a reason to deny coverage. The Court finds that ISC's and Rau's interpretation improperly relies on isolated phrases in the Policy without reference to the contract as a whole.

The Court assumes, for purposes of summary judgment, that United intended to change the Policy and that the failure to accomplish the task was unintentional. However, the Court cannot find, under the language of the Policy, that this unintentional failure creates coverage that would not otherwise exist. The Policy stated that any changes to the terms of the Policy required Markel's "consent." (ECF No. 19-1 at 19.) Further, it provided that "the policy's terms can be amended or waived only by endorsement issued by us and made a part of this policy." (*Id.*) Regardless of where the breakdown in communication occurred, there is no dispute that the producer did not make a change request in writing and that Markel did not consent to any change. Under the plain language of the contract, no changes to the Policy to add coverage for the Ford #4497 were made.

Thus, to find coverage, the Court would have to find that the provision regarding misrepresentations overrides the other provisions of the Policy or that there is some ambiguity created by the Policy, which would be construed in favor of the insured. Neither is true. The provision unambiguously refers to a failure to disclose or a misrepresentation that cannot form the basis of a denial of coverage. Under this provision, had United's intent to add the Ford #4497 been communicated to Markel, and the change accepted through an endorsement, an unintentional misrepresentation regarding the vehicle would not have been grounds to deny coverage. Here, no *mis*representations were made to Markel about the Ford #4497. United did not fail to disclose any material facts about the Ford #4497 in the March 30 email, and Markel is not relying on such concealment or misrepresentation as grounds to deny coverage. Accordingly, the provision titled "Unintentional Failure to Disclose Hazards" was not triggered.

If the interpretation advanced by United and Rau is correct, then there would be no practical difference between the circumstances of this case and the circumstance where the insured had intended to request a coverage change, and even had an internal memo to back up the claimed intent, but (unintentionally) forgot to make the request. To find coverage under that scenario would run counter to black letter law: It is a well-settled principle of Indiana law that courts "may not rewrite an insurance contract." *Keckler v. Meridian Sec. Ins. Co.*, 967 N.E.2d 18, 28 (Ind. Ct. App. 2012) (quoting *Bowen v. Monroe Guar. Ins. Co.*, 758 N.E.2d 976, 980 (Ind. Ct. App. 2001)). "The power to interpret insurance

policies does not extend to changing their terms." *Id.* (citing *Gregg v. Cooper*, 812 N.E.2d 210, 215 (Ind. Ct. App. 2004)).

For these reasons, the Court finds that the provision related to unintentional misrepresentations does not require that Markel provide coverage for the Ford #4497.

**B.     United and Rau—Reformation and Equity**

*1.      Reformation*

United and Rau argue that the Policy should be reformed to provide coverage for the Ford #4497 due to mutual mistake. Markel does not agree that there was a mutual mistake or a meeting of the minds.

In Indiana, courts may reform written documents where there is "a mutual mistake—meaning there has been a meeting of the minds, an agreement actually entered into, but the document in its written form does not express what the parties actually intended." *Monroe Guar. Ins. Co. v. Langreck*, 816 N.E.2d 485, 490 (Ind. Ct. App. 2004); *see also Plumlee v. Monroe Guar. Ins. Co.*, 655 N.E.2d 350, 356 (Ind. Ct. App. 1995) ("The primary purpose of reformation is to effectuate the common intentions of the parties to the instrument which were incorrectly reduced to writing.") (citing *Pearson v. Winfield*, 313 N.E.2d 95, 99 (Ind. Ct. App. 1974)). Reformation is not available where there has been no meeting of the minds because reforming a contract in favor of one party contrary to the intent of the other party is the impermissible rewriting of a new or different contract. *Plumlee*, 655 N.E. 2d at 356.

Rau asserts that the parties had a meeting of the minds:

ISC knew of UEMS' intent to put the Ford #4497 back on the policy. UEMS' February 27, 2015, email to ISC revealed UEMS' intent to take the Ford #4497 off the policy for 60 days while being repaired and then to put it back on the policy. Thus, ISC, as MIC's agent, had shared knowledge of that intent and knew the Ford #4497 vehicle information, but failed to follow through with putting it back on the policy either by UEMS' direct request on March 30 via email, or by the end of the 60-day period, which would have been April 28, 2015.

(Rau's Resp. and Cross-Mot. 17, ECF No. 114.) The February 27, 2015, email is central to Rau's assertions that the parties had a meeting of the minds. The Court, having considered the February 27 email, finds that it does not express an intention to put the Ford #4497 on the Policy after a designated period of time.

Rau characterizes the email as an understanding that the Ford #4497 would only be removed from the schedule of covered vehicles for sixty days. The wording of the email belies this interpretation. Pavek's email identified two trucks with motor issues. Pavek asserted that he did not know if the Ford #4497 was "salvageable." He asked that Truck 2 be removed, and advised, "This unit is the unit I am unsure of viability moving forward but it will [be] some time before I do, say at least 60 days + repair time." This, of course, was not a request to automatically put the Ford #4497 back on the Policy in sixty days. Pavek did not even know if the vehicle was salvageable. He thought it would be at least sixty days before he could even determine the vehicle's status.

For its part, United argues that there was a mutual mistake because United mistakenly thought that Markel would "do as directed" and that the Ford #4497 was properly insured, and Markel mistakenly failed to add the Ford #4497 to the Policy or to notify United that the Ford #4497 would not be a covered auto. (United Resp. and Cross-

Mot. 11, ECF No. 116.) Putting aside the obvious fact that this does not describe a mutual mistake, or a meeting of the minds, nothing in the Policy required Markel to do as United directed. As stated above, any changes required Markel's consent. So if United believed that all it had to do to change its existing coverage was email ISC, and Markel would be compelled to consent to the change, the mistake was theirs alone.

Reformation is an extreme equitable remedy used to relieve the parties of mutual mistake or fraud. *Estate of Reasor v. Putnam Cty.*, 635 N.E.2d 153 (Ind. 1994). The evidence does not establish that the true intentions of both parties was to insure the Ford #4497. To find otherwise would be to rewrite the contract in a way Markel never intended when it provided "Symbol 7" coverage.

### 2. *Equitable Relief*

United and Rau assert that coverage must be extended as a matter of equity. United argues that it consistently paid premiums to insure five ambulances, and at no time had more than five ambulances on the road. Further, it followed the procedures required of it when it gave notice to ISC.

Rau similarly contends that United properly sent the March 30 email to effectuate coverage. The changes United requested would not have caused any increase in premiums or resulted in any increased risk exposure for Markel. Further, given the history of their dealings, United had no reason to doubt that ISC and Markel would make the requested policy change. United further had no reason to believe that Rosen had not received Pavek's March 30 email. Accordingly, it was through no fault of the insured that the requested policy change was not effectuated.

Rau cites *State Farm Mutual Automobile Insurance Co. v. Oss*, 468 N.E.2d 439, 442 (Ill. App. Ct. 1984), for the proposition that coverage should not be denied when an insured is not at fault for a contemplated contract not being effectuated. Although the principle may be accurate, the facts of that case established that "the creation of a written contract of insurance was contemplated by the parties" because they first had an oral contract. *Id.* (finding that where an oral contract of insurance existed, insurance company could not deny coverage when company failed to properly process request so that plaintiff did not receive the application). Thus, in *Oss*, the required elements for formation of a contract existed. It simply had not been reduced to writing.

Here, regardless of whether Markel *would* have changed the Policy, it did not actually agree to. It is undisputed that (1) ISC did not have authority to bind coverage, and; (2) United received no response to its request. A one-sided inquiry does not form a contract. *See, e.g.*, *Hinkel v. Sataria Distrib. & Packaging, Inc.*, 920 N.E.2d 766, 770 (Ind. Ct. App. 2010) ("The modification of a contract, since it is also a contract, requires all the requisite elements of a contract.") (quoting *Hamlin v. Steward*, 622 N.E.2d 535, 539 (Ind. Ct. App. 1993)). The Policy unambiguously provided that autos covered were "[o]nly those 'autos' described in Item Three of Declarations for which a premium charge is shown." (ECF No. 19-1 at 11, 27.) Thus, the premiums charged were for those specific vehicles, and no others. That Markel may not have charged additional premiums had it issued an endorsement removing the 1994 Ford and adding Ford #4497, does not change the nature of the coverage the parties specifically contemplated and contracted for.

In arguing, as they do to support their claim of equitable relief, that United did nothing wrong, the parties largely ignore whether Markel did anything wrong. "Estoppel is an equitable doctrine designed to prohibit an injustice that would occur without its application." *Little v. Progressive Ins.*, 783 N.E.2d 307, 315 (Ind. Ct. App. 2003) (citing *Levin v. Levin*, 645 N.E.2d 601, 604 (Ind. 1994)). To assert equitable estoppel against an insurer, "the conduct of the insurer must be of a sufficient affirmative character to prevent inquiry or to elude investigation or to mislead and hinder." *Paramo v. Edwards*, 563 N.E.2d 595, 599 (Ind. 1990); *see also Little*, 783 N.E.2d at 315. Indiana adheres to the general rule that the doctrine of estoppel is not available to create or extend the scope of coverage of an insurance contract. *Employers Ins. of Wausau v. Recticel Foam Corp.*, 716 N.E.2d 1015, 1028 (Ind. Ct. App. 1999).; *see also Little*, 783 N.E.2d at 316 (noting that "application of the doctrine of estoppel is not intended to create new rights" but to "preserve rights that one party already had"). Consequently, while an insurer's conduct can waive provisions of an existing policy, equitable estoppel cannot extend coverage that does not exist. *Little*, 783 N.E. 2d at 316 (citing *Egnatz v. Med. Protective Co.*, 581 N.E.2d 438, 441–42 (Ind. Ct. App. 1991)).

The Court finds that the analysis in *Little* is instructive to this case. In *Little*, the insurer denied uninsured motorist coverage to a driver named on the insurance policy because the policy owner had rejected uninsured motorist coverage when he obtained the policy. 783 N.E.2d at 309. The named driver argued that adding her to the policy was akin to the issuance of a new policy that required the insurer to once again offer uninsured motorist coverage. The named driver argued that, by sending a form for the

policy holder to reject uninsured motorist coverage along with the letter indicating that the named driver had been added to the policy, the insurer's actions were sufficient to lead her to believe that uninsured motorist coverage was being provided to her. *Id.* at 314.

Although noting that equitable estoppel "is not limited to circumstances in which an actual false representation or concealment of existing material fact occurred," *id.* at 315, the court nonetheless held that equitable estoppel was not available to the named driver. Whether conduct rises to the level sufficient to justify the application of equitable estoppel depends on the facts and circumstances of that particular case. *Id.* "If two parties 'stand mentally on equal footing, and in no fiduciary relation,' we will not protect a person who failed to exercise common sense and judgment." *Id.* (quoting *Paramo*, 563 N.E.2d at 599). The court acknowledged that combining the rejection form and the declarations page in the same mailing "may have caused some confusion," but thought "it should have led to further inquiry . . . rather than prohibiting further inquiry." *Id.* If the named driver had read the forms that had been sent to her, she would have been aware that she was not receiving uninsured motorist coverage. Finding that the insurer did not mislead or prevent inquiry, and that instead the named driver failed to exercise her common sense, the court held that equitable estoppel was not available based on all of the facts and circumstances of that particular case. *Id.* at 316.

Here, Rau and United do not point to any conduct of Markel that prevented inquiry, eluded investigation, or mislead and hindered United in any way. *See Little*, 783 N.E.2d at 315; *Paramo*, 563 N.E.2d at 599. Although the Policy stated that notice to its agent would be considered notice to Markel, that referred only to how the insured could

communicate. It changed nothing concerning ISC's inability to bind coverage. Nor did it alter what kind of *response* was necessary to effectuate any change the notice requested. The provision of the Policy referring to changes unambiguously required Markel's consent. There is nothing misleading about that provision. Nor was the type of coverage misleading. It was plainly set forth in the Policy and Pavek acknowledged in his email to Rosen that he was aware that the insurer did not like United to add and remove units "like musical chairs."

United assumed that its March 30 email to ISC was adequate notice to Markel that United wanted to add the Ford #4497 to the Policy. That may have been an appropriate assumption in a vacuum, but it ignores the entirety of the facts and circumstances of the case. No action by Markel or language in the Policy suggested that further inquiry or confirmation was not reasonably required when United did not hear from ISC or receive an endorsement in response to its notice. United's decision not to confirm coverage, whatever its genesis, was wholly unrelated to Markel's conduct. Equity does not require that Markel be estopped from denying coverage.

C.      **The March 30, 2015, Email**

Rau, United, and ISC all present argument regarding the impact of the March 30 email. Rau asserts that the Court should find, as a matter of law, that United sent the March 30, 2015, email to Rosen at ISC, and that it is more likely than not that Rosen received it. United likewise asserts that it should be determined, as a matter of law, that United properly directed that Markel list the Ford #4497 on the Policy when it emailed ISC. ISC's position is that if the March 30, 2015, email was sent, it did not reach Rosen or

ISC. Additionally, United did nothing to confirm that coverage was bound on that vehicle.

The Court finds that the facts surrounding the March 30, 2015, email are genuinely disputed. Pavek claims that he sent the email. Rosen asserts that he did not receive it. These two claims are not necessarily inconsistent, but there is a dispute as to what happened to the email after Pavek pushed "send." According to Pavek, he did not receive a delivery failure message letting him know that the email had not been received by its intended recipient. But Pavek had, in the past, sent emails that Rosen had no record of receiving, and Pavek did not claim to receive delivery error messages for these emails either. Rather, he thought they were getting hung up in ISC's email server.

Post-accident, Pavek forwarded the email that Blankinship, the purported internal cc recipient, located. When Pavek forwarded the email to Rosen, he admitted that he could not locate a reply to his original email. United produced two copies of the email during discovery. One, which was contained in the post-accident email Pavek sent to Rosen, showed that Blankinship had been copied on the email. In fact, it was Blankinship who located the email and sent it to Pavek. A second copy had no markings showing Blankinship as a cc recipient. Rather, it appeared to be sent to Blankinship later.

*@isc9400.com

Mail    Back   Archive   Spam   Delete   Move to Inbox   Labels   More    75 of abo

Ambulance Change   Inbox  x

Inbox (1)

Sent Mail

Drafts

Spam

Trash

[Gmail]

  Advertising Vendors

  Back UP

Deleted Messages

Notes

On-Line Applicants

Sent Messages

Google Calendar

Pavek, Steven <s.pavek@unitedems.com>
to Jason

**From:** Steven Pavek [mailto:s.pavek@unitedems.com]
**Sent:** Monday, March 30, 2015 5:49 PM
**To:** Jack Rosen
**Subject:** Re: Ambulance Change

Jack,
Also before I forget we took a truck off the policy a few months
ago for a transmission issue that was down for a few months.
I'm sure you recall this. I know Thomco doesn't like us to add
& remove units like musical chairs. However this truck I have
just been informed passed inspection so it can be pressed
back into service. The back truck that old 1994 that we added
at renewal. Let take that off as it will be removed from service.
It will still be plated and certified as a back up unit but
removed from service with supplies and stock there is no need
to insure it.

So remove 1994 E-350 VIN 1FDJS34M4RHB34050
And put back on the truck that we took off which is.

2003 E-350 VIN #1FSS34F32HA74497

I can just write int in on the state form and hopefully they wont
have a problem with it.

*Steven Pavek*

**Partner / Executive Director**
<image001.jpg>
(219) 714-4000 Phone/Fax  Ext:2020

(*See* ECF No. 118-1 at 2.) Markel hired an expert to conduct a forensic search of United's email system, but the oldest email in the account, as of May 18, 2018, was from May 15, 2016. Accordingly, he could not determine the existence, or the content, of an email from March 30, 2015.

Rau has offered information (*See* Rau's Motion to Take Judicial Notice of Computer Science Facts, ECF No. 115), describing how emails are typically created and delivered. This general information does little to establish what happened in this particular case in light of the facts set forth above. For example, although delivery failure messages are typically generated when an error in the delivery process has occurred, the

facts of this case suggest that previous emails from United had not been received by Rosen, yet no such bounce messages were generated in those instances either.

Rau and United also rely on Indiana's Uniform Electronic Transactions Act (UETA) to argue that the Court should find that United sent the March 30, 2015, email. *See* Ind. Code § 26-2-8-101 et al. Indiana's UETA provides the following regarding when an electronic record, including an email, is considered sent:

> (a) Unless otherwise agreed between the sender and the recipient, an electronic record is sent when the information is addressed or otherwise directed properly to the recipient and either:
> > (1) enters an information processing system outside the control of the sender or of a person that sent the electronic record on behalf of the sender; or
> > (2) enters a region of an information processing system that is under the control of the recipient.

Ind. Code § 26-2-8-114(a). The statute provides the following regarding receipt:

> (b) Unless otherwise agreed between the sender and the recipient, an electronic record is received when:
> > (1) it enters an information processing system that the recipient has designated or uses for the purpose of receiving electronic records or information of the type sent from which the recipient is able to retrieve the electronic record; and
> > (2) the electronic record is in a form capable of being processed by that system.

Ind. Code § 26-2-8-114(b).

United and Rau have submitted some evidence that the March 30 email was sent. Pavek testified that he sent the email and did not receive a delivery error message. Pavek also testified that he found a copy of the email in his sent mail folder. The record contains a copy of the March 30 email that Pavek forwarded to Rosen after the accident, purporting to be first forwarded from Blankinship to Pavek. However, this evidence does not

conclusively establish that the email was, in fact, sent as that term is defined in the UETA. Further, ISC has designated evidence that a jury could rely on to conclude that the March 30 email, even if it was sent, was not received. But ISC's lack of receipt is not entirely without evidentiary challenge. Pavek's testimony that he was able to locate it in his sent folder, and that he never received an error message are facts that a jury could consider. Additionally, the cc recipient also located the email. On the other hand, because Blankinship was a United recipient his receipt may not be proof that the email "entered an information processing system that the recipient has designated or uses for the purpose of receiving" emails. Ind. Code § 26-2-8-114(b)(1).

As stated above, a court's role in deciding a motion for summary judgment "is not to sift through the evidence, pondering the nuances and inconsistencies, and decide whom to believe. The court has one task and one task only: to decide, based on the evidence of record, whether there is any material dispute of fact that requires a trial." *Waldridge*, 24 F.3d at 920. The Court finds that questions of fact remain whether Pavek attempted to send an email on March 30, 2015, whether the email left United's server, and whether ISC received it. As will be discussed in the next section, those issues of fact preclude summary judgment on the third-party claims.

**D.     Third-Party Claims**

United's Third-Party Complaint against ISC sets forth a claim for breach of contract and negligent performance of duties related to the procurement of insurance for the Ford #4497. ISC argues that it is entitled to summary judgment because there was no meeting of the minds as United did not follow-up on the March 30, 2015, email.

"All insurance agents who undertake to procure coverage owe their clients a general duty of reasonable care and skill in obtaining insurance and following their clients' instructions." *Ind. Restorative Dentistry, P.C. v. Laven Ins. Agency, Inc.*, 27 N.E.3d 260, 264 (Ind. 2015) (citing *Filip v. Block*, 879 N.E.2d 1076, 1085 (Ind. 2008)). An insured may allege a breach of the duty to procure as either a claim for negligence or a breach of contract. *Id.* Once an agreement is established under either theory, the duty to procure is the same. *Id.* at 268.

"The question of agency for the insured must be determined from all the facts and circumstances of the case, together with the conduct of the parties and the communications between them." *Stockberger v. Meridian Mut. Ins. Co.*, 395 N.E.2d 1272, 1279 (Ind. Ct. App. 1979). Here, the Court cannot agree with ISC that, taking the facts most favorable to United, there was no meeting of the minds. For purposes of ISC's summary judgment motion, the Court must assume that ISC received United's email, at least as the term receipt is defined under Indiana's UETA. The email provided the information that would have been sufficient for ISC to submit a written request to Markel for a change in the Policy. The parties had previously added and removed vehicles using the same information communicated via the same method.

United argues that ISC was required to confirm that coverage had been bound, and cites to *Stockberger*. However, *Stockberger* does not stand for the proposition that an implied contract to procure insurance cannot arise where the insured does not confirm coverage. In *Stockberger*, the plaintiff "was aware that he had not provided [the agent] with specific information to effectuate a transfer" of coverage based on their coffee shop

conversation. 395 N.E.2d at 1279. It was this lack of essential details, in combination with the failure to confirm coverage, that caused the court to conclude that the insured's own omission caused his loss. Here, taking the facts most favorable to United, it was not aware that any additional items of information were necessary. In the same vein, ISC did not lack necessary details to effectuate coverage changes.

Likewise, in *Estate of David Stone v. Peoples Ins. Agency, LLC*, No. 415CV00015TWPTAB, 2016 WL 4458473 (S.D. Ind. Aug. 24, 2016), also cited by ISC, the representative of an estate left a voicemail message attempting to procure coverage. But the estate was a new potential insured, and never provided the agent with the essential elements and details it needed to procure insurance coverage. In fact, the agent had never even had prior dealings with the plaintiff. 2016 WL 4458473, at *4. Under those circumstances, there was no agency relationship and no meeting of the minds that could give rise to a duty to procure insurance. *Id.* at *5.

For reasons set forth above, there are issues of fact surrounding the sending and receipt of the March 30 email. However, for purposes of ISC's motion for summary judgment against United, the Court must assume that ISC received the email. This email contained all the necessary details to request that Markel replace one of the covered vehicles with the Ford #4497. Further, based on the parties' previous dealings, United had reason to believe that ISC would take action to obtain an endorsement or, at the very least, advise United with any problems with its request. Material questions of fact thus preclude the issuance of summary judgment in favor of ISC on United's third-party claims.

# CONCLUSION

For the reasons set forth above, Plaintiff's Motion for Summary Judgment [ECF No. 94] is GRANTED; Rau's Cross-Motion for Summary Judgment [ECF No. 114] is DENIED; United Emergency Medical Services, LLC's Cross-Motion for Summary Judgment [ECF No. 116] is DENIED, and; Third Party Defendant Insurance Service Center, Inc.'s Motion for Summary Judgment Against Third Party Plaintiff United Emergency Medical Services, LLC [ECF No. 122] is DENIED. Rau's Motion to Take Judicial Notice of Computer Science Facts [ECF No. 115] and ISC's Request for Oral Argument [ECF No. 129] are DENIED AS MOOT.

By separate order, the Court will set a telephone scheduling conference concerning the Third-Party Complaint.

Finding no just reason for delay, the Court directs the entry of final declaratory judgment as follows:

(a) MARKEL has no duty under the Policy to defend UNITED against the Rau Suit;

(b) MARKEL has no duty under the Policy to defend NADERMOHAMMADI against the Rau Suit;

(c) MARKEL has no duty under the Policy to indemnify UNITED with respect to the Rau Suit; and

(d) MARKEL has no duty under the Policy to indemnify NADERMOHAMMADI with respect to the Rau Suit.

SO ORDERED on June 27, 2019.

*s/ Holly A. Brady*
JUDGE HOLLY A. BRADY
UNITED STATES DISTRICT COURT